UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEWBURGH/SIX MILE LIMITED
PARTNERSHIP II,

        Plaintiff,

v.

ADLABS FILMS USA, INC.,

        Defendant.

_____/

Case No. 09-cv-11067

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT** (docket no. 19) **AND
DENYING DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS
ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM** (docket no. 28)

     This action involves a commercial real estate contract dispute.  Plaintiff Newburgh /

Six Mile Limited Partnership II ("Newburgh") sued Adlabs Films USA, Inc. ("Adlabs")

alleging  breach of contract and seeking declaratory relief, specific performance, and

contract damages.  The Court's jurisdiction is predicated on diversity jurisdiction, 28 U.S.C.

§ 1332(a).   The matter comes before the Court on Newburgh's motion for summary

judgment on its claim for contract damages and Adlabs' counterclaims.  Well after the close

of discovery and the filing of Newburgh's summary judgment motion, Adlabs sought leave

to amend its answer, affirmative defenses, and counterclaims.  The Court will deny Adlabs'

leave to amend and will grant Newburgh's motion for summary judgment.

**FACTS**

     The following facts are undisputed, unless otherwise indicated.

A.  <u>Lease</u>

     On March 13, 2008, Newburgh (landlord) and Adlabs (tenant) entered in to a 15-year

lease ("Lease") for premises in the Laurel Park Place office building in Livonia, Michigan

("Leased Premises"). Lease, 1 (docket no. 19, ex. 1).  The Lease is fully executed by both parties.  Under its terms, Adlabs agreed to occupy the Leased Premises and use them primarily as a theater and auditorium for showing pictures, telecasts, and other audio-visual presentations, and for meetings and other public presentations and entertainment.  Lease ¶ 5.  Annual rent was $512,304.00 for each of the first two years; $683,072.04 for each of the next three years, $725,764.00 for each of the next five years, and $768,456.00 for each of the last five years.  *Id.* ¶ 1(f).  Adlabs was responsible for all real estate taxes associated with the premises.  *Id.* ¶ 14.

The Lease contains an express merger clause that states:

> Entire Agreement.  This Lease shall constitute the entire agreement [of the] parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect.  This Lease cannot be changed, modified or discharged but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

*Id.* ¶ 23.

At the time the Lease was signed, the premises were being occupied by American Multi-Cinema, Inc. ("AMC"), pursuant to a lease agreement between AMC and Newburgh that expired in October 2009.  Counterclaim ¶ 8.  Accordingly, the Lease was to commence the earlier of "[a]pproximately January 15, 2010 (dependent upon obtaining the space from the current tenant)" or "the date [Adlabs] opens for business in the [premises]."  Lease ¶¶ 1(d), 3.

Although the Lease with AMC ended in October 2009, Newburgh agreed to use commercially reasonable efforts to obtain from AMC an early termination so that delivery to Adlabs could occur prior to January 1, 2009, if possible.  *Id.* ¶ 3.  The Lease *did not* include a provision to the effect that Adlabs could terminate the Lease if Newburgh was

unable to obtain early termination from AMC and deliver possession before January 1, 2009. Instead, according to the terms of the Lease, if Newburgh was unable to obtain an early termination and deliver possession before January 1, 2009, then for each month in 2009 that Newburgh was unable to deliver possession, Adlabs would be entitled to one month of 50% rent. *Id.* The Lease provides an example of how this works: if Adlabs took possession on March 2009, it would be entitled under the terms of the Lease to pay 50% rent for the first three months of the lease term (March, April, and May). *Id.*

The Lease terms also required Newburgh to deliver possession in "as-is, where-is" condition, which means that the premises would retain "a substantial majority of the improvements, fixtures and trade fixtures from the previous tenant" for delivery to Adlabs with the premises. *Id.* ¶ 2. Failure to deliver the premises in this condition was a "dealbreaker":

> In the event Landlord is unable to deliver possession of the Leased Premises with said substantial majority of the improvements, fixtures and trade fixtures left in place for use and possession by Tenant, Landlord shall notify Tenant in writing of that inability prior to delivery of possession, and Tenant shall have thirty (30) days in which to either (a) accept delivery of possession, or (b) terminate the Lease.

*Id.*

B. Conduct of the Parties

Around November 2008, Newburgh, through its broker, began negotiating with AMC in an attempt to obtain an early termination and agreement to leave the improvements, fixtures, and trade fixtures in place. Schostak dep. 19-20; 22-23; 38-39 (docket no. 18, ex. 2). A representative of Adlabs stated in her deposition that Adlabs is aware of no factual basis for claiming that Newburgh did not use commercially reasonable efforts to obtain an

early termination, other than the simple fact that they did not have possession by January 1, 2009.  Gangwani dep. 67 (docket no. 19, ex. 3).

During the final stages of negotiation between Newburgh and AMC with respect to an early termination and fixture agreement, Adlabs advised Newburgh in a letter dated February 3, 2009 that it was terminating the Lease because it was not given possession by January 1, 2009.  Pawar Letter (docket no. 19, ex. 4) ("Therefore in accordance with the terms of the Agreement between the parties, you are hereby advised that Adlabs is exercising its right to not move forward with the transaction.").  Adlabs' representative stated in her deposition that it was her understanding that the last sentence of this letter, quoted above, "was advising the landlord that Adlabs was terminating the lease."  Gangwani dep. 77.  Newburgh placed Adlabs in anticipatory breach and requested that Adlabs withdraw the letter on numerous occasions, which Adlabs refused to do.  Anderson dep. 36 (docket no. 19, ex. 5).

Two days later, on February 5, 2009, Adlabs advised Newburgh in another letter that, "[t]here has been a drastic change in circumstances since the parties discussed the proposed lease terms.  [Adlabs'] financial position has changed and that makes the proposed lease not economically viable."  Pawar Letter II (docket no. 1, ex. 3).  The letter continued: "To the extent that you maintain the position that Adlabs is bound by the proposed lease, to which we disagree, under well-established rule of law, the landlord has a duty to actively mitigate its damages and seek out new tenants."  *Id.*

On February 19, 2009, shortly after Adlabs sent its termination letters, AMC notified Newburgh in an email that it would be accepting Newburgh's offer to vacate the Laurel Park premises and leave its fixtures, trade fixtures, and equipment in place for use by Adlabs.  Email (docket no. 19, ex. 6) ("It looks like [AMC is] going to do your deal at Laurel Park.

We are circulating a deal sheet and Ron Herman will handle it when it is fully executed. I believe it will be on your terms and nothing to discuss. Should have an answer this week!"). Newburgh drafted a proposed early termination agreement for AMC's review and comment. Email and attached proposed termination agreement (docket no. 19, ex. 7). The agreement called for AMC's lease to end no later than March 31, 2009, instead of the original October 31, 2009 date. *Id.* ¶ 1. In addition, AMC agreed to leave the premises in "'as-is' condition with no removal of fixtures, improvements, trade fixtures, shelving, show cases, or other property of any kind." *Id.* ¶ 4. Newburgh agreed to pay AMC an early termination fee of $500,000. *Id.* at ¶ 2. Newburgh and AMC never executed the early termination agreement because Adlabs terminated the Lease. Schostak dep. 22-23. Accordingly, Newburgh never had to pay AMC $500,000.

Once it was clear Adlabs was not going to retract its termination letter, Newburgh revoked its offer to AMC so it could maintain a tenant in the premises at least until October 31, 2009, the original expiration date of the AMC lease. Schostak dep. 23. Newburgh also began looking for a replacement tenant for the premises once AMC vacated. It contacted theater operators in Southeast Michigan looking for prospective tenants. Although various potential tenants expressed interest in the premises, Newburgh was unable to find an economically viable tenant. Anderson dep. 32-34, 46-49, 73-74.[1] Newburgh was, however, able to negotiate an agreement with a theater management company, Insight Management Consultants, Inc. ("Insight"), who agreed to operate the premises as a movie theater under a five-year management agreement. *Id.* 32, 46-49; Management Agreement (docket no. 19, ex. 8).

---

[1] Pages 73-74 of the Anderson deposition are found at docket no. 29, ex. 2.

Under the terms of the management agreement, Insight is to prepare an annual operating budget setting forth the estimated revenue and operating expenses of the theater. Management Agreement Art. II, ¶ A(10) and Operating Budget (docket no. 19, ex. 9). The budget does not include the real estate taxes as an expense. Therefore, this expense, which was to have been paid by Adlabs, is an expense that Newburgh must now cover. In 2009, the real estate taxes totaled $95,330.12. Real Estate Tax Computation (docket no 19, ex. 10).

Insight must pay into an escrow account a certain amount of money ("operational reserve") that is to be used to pay for operating budget shortfalls and extraordinary expenses not contemplated in the Operating Budget, as well as any incentive payments payable to Insight. At the end of each year, if any money remains in the operational reserve, Newburgh may transfer that amount to an "Excess Cash Account," which is defined under the management agreement as the cash on deposit in excess of the reserves established by Insight for working capital of the theater. The upshot of all this is that if Insight's operating budget proves accurate, and there are no extraordinary expenditures, at the end of each year, the Excess Cash Account will consist of the sum designated as "operational reserves." Newburgh keeps this amount.

In the 2010 operating budget, Insight budgeted the sum of $300,000 as operational reserves. It also identifies the sum of $10,210.94[2] as "Gross Profits." Therefore, based on the operating budget, under the terms of the Management Agreement, Newburgh will

_____

[2] Newburgh indicates in its brief that the gross profits estimated by Insight in its operating budget is $10,240.94. Review of Insight's 2010 operating budget reveals that the estimated gross profits is $10,210.94, or thirty dollars less than that stated in the brief.

receive the sum of $310,210.94, less annual real estate taxes of $95,330.12, for a yearly total of $214,880.82.

## PROCEDURAL HISTORY

Newburgh moved for summary judgment only on its claim for damages. The motion has been fully briefed. The parties have attended settlement conferences on two occasions, once before the hearing on the summary judgment motion here, and once afterwards, but the negotiations have not resulted in settlement. After the first settlement conference, and three weeks before the Court heard arguments on Newburgh's motion, Adlabs filed a motion seeking amendment of the scheduling order and leave to amend its answer, affirmative defenses, and counterclaims. Adlabs wants to add a claim against Newburgh for specific performance and the affirmative defense failure to mitigate damages. *See* Proposed Amended Answer to Complaint and Amended Counterclaim (docket no. 28, exs. A & B). The Court heard arguments on both pending motions on April 29, 2010. After the hearing the Court requested further briefing from Newburgh regarding its calculation of damages.[3] Newburgh submitted a supplemental brief to which Adlabs has not responded.

## DISCUSSION

The Court first addresses Adlabs' motion for leave to amend the scheduling order and to file an amended answer with affirmative defenses and amended counterclaim. The Court will then address Newburgh's motion for summary judgment.

---

[3] The Court also encouraged the parties to meet and try to resolve their dispute before the Court entered an Order and the dispute became intractable.

I.  Adlabs' Motion to Amend the Scheduling Order and for Leave to Amend

The scheduling order provides that parties must seek leave to join new parties or amend the pleadings, and that in no case shall leave be granted after the close of the dispositive motion cut-off date of November 30, 2009.[4]  Docket no. 11, 1 n.1; *see* Fed. R. Civ. P. 16(b)(3)(A) ("The scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions.").  Accordingly, to obtain leave to amend after the dispositive motion cut-off, the party seeking leave must first obtain amendment of the scheduling order by demonstrating good cause for failure to seek leave sooner.  *See Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003) ("Once the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)"); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (noting that Rule 16's standards may not be "short-circuited" by those of Rule 15).  Therefore, if good cause does not exist to amend the schedule, leave to amend the pleadings cannot be granted despite the liberal standards of Rule 15(a)(2).

A.  Amendment of the Scheduling Order

Adlabs filed its motion seeking leave to amend its pleadings and the scheduling order on April 8, 2010, nearly six months after the deadline for doing so.  "A schedule may be modified only for good cause shown and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Generally, a court choosing to modify the schedule upon a showing of good cause may do so if the current schedule cannot reasonably be met despite the diligence

---

[4] Although the scheduling order does not state expressly that leave to amend may not granted after the dispositive motion cut-off, that is the clear import of the placement of footnote 1 in the dispositive motion cut-off box and the requirement under Fed. R. Civ. P. 16(b)(4) that the Court limit the time for amendment.

of the party seeking the extension.  *Leary*, 349 F.3d at 906.  Prejudice to the party opposing amendment is also a relevant consideration.  *Id.* at 909.

Adlabs has not shown good cause justifying amendment of the scheduling order.  Its sole justification for not seeking leave earlier is that its counterclaim for specific performance was not available prior to the deadline because AMC was in still in possession of the premises until October 31, 2009.  But, AMC vacated the premises one month before the deadline for seeking leave to amend, giving Adlabs a period of time in which to file its motion seeking leave.  Adlabs does not explain why it did not seek leave to amend during that time.  Its argument in this regard is also unpersuasive because Adlabs knew from the time it filed its answer and original counterclaim that AMC would vacate in October 2009, so there is no excuse for not filing its motion seeking leave once AMC vacated.  Counterclaim ¶ 8; *see Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (finding lack of good cause for extension of scheduling order because "the plaintiff was obviously aware of the basis of the claim for many months, especially since some underlying facts were made part of the complaint").  The Court might be more sympathetic had Adlabs sought amendment shortly after the deadline -- perhaps a week or two -- but it waited until nearly six months after the deadline to seek leave to amend.

Although not explicit in its motion, Adlabs also seeks to amend its affirmative defenses to include a defense of failure to mitigate damages.[5]  Adlabs gives no reason for its failure

---

[5] The Court finds that Adlabs' failure to mention in its motion that it was also seeking to plead failure to mitigate damages as an affirmative defense, yet at the same time including it in the amended answer to be a questionable tactic, especially when Adlabs expressly drew the attention of the Court and opposing counsel to its request to plead a counterclaim of specific performance.  In Michigan, failure to mitigate damages is an affirmative defense that must be pleaded and proved by the breaching party.  *See Fothergill v. McKay Press*, 374 Mich. 138, 140 (1965).  One conclusion that may be drawn here is that Adlabs neglected to plead the affirmative defense, later realized its failure, and then attempted to

to plead failure to mitigate damages in its initial answer or for its failure to seek leave to amend before November 30, 2009. Even if it lacked a factual basis for raising the defense in its original answer, it certainly knew of Newburgh's mitigation efforts by November 3, 2009, when it completed the depositions of Newburgh's representatives, nearly one month before the deadline for seeking leave to amend. If Adlabs believed Newburgh's mitigation efforts were deficient, the defendant could have sought to amend its answer at that point, before the deadline for seeking amendment. Adlabs has not demonstrated that it was unable to meet the amendment deadline despite being diligent.

As for prejudice, the Court finds that amendment of the scheduling order at this point would unduly and unfairly prejudice Newburgh. It would permit Adlabs to seek leave to amend its pleadings, which, if granted, would require Newburgh to proceed to trial without having completed discovery on the added counterclaim and affirmative defense. Even were the Court to reopen discovery, Newburgh would be forced to expend additional resources in determining the factual basis for the claims and defenses raised in the amended pleadings. In addition, it would require Newburgh to prepare an additional defense strategy and to defend against the new claim long after discovery had closed and it had filed its motion for summary judgment. *See Duggins*, 195 F.3d at 834 ("At least one Sixth Circuit decision has held that allowing amendment after the close of discovery creates significant prejudice, and other Circuits agree." (citations omitted)). Adlabs has not negated the potential for prejudice that any requested extension would cause.

B. Motion for Leave to Amend

---

cure the mistake by slipping it into the amended answer unnoticed.

Even assuming that Adlabs could demonstrate good cause for amending the scheduling order, the Court would still deny it leave to amend its answer and counterclaim. Rule 15(a) provides that leave to amend a pleading should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). There are certain situations, however, in which it is appropriate to deny leave to amend, such as where there is undue delay in filing, a lack of notice and undue prejudice to the nonmoving party, bad faith by the moving party, or when the amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001). While delay by itself is not sufficient to deny leave to amend, when amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier. *Wade*, 259 F.3d at 459.

As discussed above, Adlabs cannot justify its failure to seek leave to amend its answer and counterclaim earlier in the proceedings before the deadline for doing so. There is no valid reason why specific performance was not alleged in the original counterclaim and it should have been alleged as early as November 1, 2009, when the lease between AMC and Newburgh expired and AMC vacated the premises. Failure to mitigate also could have been alleged in the original answer, and should have been alleged no later than immediately after the Newburgh representative's deposition, when Adlabs learned of Newburgh's mitigation efforts. Instead, however, Adlabs chose to wait six months to seek leave to amend the complaint.

Additionally, however, Newburgh would suffer prejudice were Adlabs permitted to amend its answer and counterclaim. In *Wade*, the Sixth Circuit found the district court's denial of leave to amend was a proper exercise of its discretion. 259 F.3d at 459. In denying leave to amend, the district court found:

> [T]o allow the amendments proposed by plaintiff would result in significant prejudice to the defendant. The dispositive motion deadline has already past [sic], and defendant has filed a motion for summary judgment on all claims alleged in the original complaint. It is also apparent that significant discovery has been completed including more than 20 depositions. Obviously, some if not all of the depositions already taken would have to be supplemented to address the multiple issues raised in the proposed amendments and other extensive and additional discovery would have to be undertaken as well.

*Id.* (quoting district court opinion).

The situation is nearly identical here. The dispositive motion deadline has passed and Newburgh has moved for summary judgment on its claims and Adlabs' original counterclaims. Significant discovery has been completed thus far, and many of the depositions would have to be supplemented to address the new claims and defenses. Since the discovery period has closed, Newburgh would have to move to reopen discovery, which the Court would not likely grant. Further discovery would certainly be necessary for Newburgh to learn of the facts upon which Adlabs relies for its failure to mitigate defense. Since the defense was not initially alleged, Newburgh had no reason to seek discovery on it. Newburgh would also have to seek discovery on the factual and legal bases for the specific performance counterclaim. It would have to determine why Adlabs believes that it can now perform the terms of the Lease when on February 5, 2009 it told Newburgh in a letter that its financial position had changed in a way that the Lease was no longer an economically viable option. It would also have to determine the basis of Adlabs' 180 degree change in position with respect to the Lease -- Adlabs has from the beginning of this action claimed that it was not obligated to perform according to the Lease, and now seeks the benefit of the obligation it previously denied. As specific performance is an equitable remedy, Newburgh would need to discover the factual basis and legal viability of a claim of specific performance in this situation.

Finally, it appears also that the amendment would be futile. A proposed amendment to a pleading is futile if the amendment cannot survive a rule motion to dismiss for failure to state a claim. *See Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 383 (6th Cir. 1993). When, as here, the motion to amend is made in response to a motion for summary judgment, the Court must consider the evidence in the record and cannot assess the proposed amendment as if the evidence does not exist. In such a case, the proposed amended pleading is futile if it could not survive the summary judgment motion. *Horacek v. Seaman*, No. 08-10866, 2009 WL 2928546, *14 (E.D. Mich. Sep. 10, 2009) (citing *Wilson v. Am. Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989)).

Specific performance is not a remedy as of right, but rests in the sound discretion of the court's exercise of its powers in equity. *Rose v. Gilbert*, 320 Mich. 455, 692 (1948). Once a lease has been terminated after a default, the defaulting party may not seek specific performance of the contract. *See, e.g., MacGlashan v. Harper*, 299 Mich. 662, 667 (1941) ("The lease having been terminated, plaintiff cannot obtain specific performance of its provisions including the option to purchase."); *Gurunian v. Grossman*, 331 Mich. 412, 419 (1951). This principle is ever more forceful when it is the *defaulting party* who is responsible for the termination. In this case, it is clear that Adlabs terminated the Lease when it advised Newburgh in a letter that it was "exercising its right to not move forward with the transaction" and later refused to withdraw the letter. An Adlabs representative confirmed that this sentence indicated Adlabs' intent to terminate the Lease. Having unequivocally terminated the Lease and forced Newburgh to find new a new tenant on short notice, it would be inequitable to allow Adlabs to enforce that Lease in order to avoid liability. Thus, Adlabs' counterclaim for specific performance is futile because it could not survive a motion to dismiss or a motion for summary judgment.

The same is true of Adlabs' proposed failure to mitigate defense. Although Adlabs did not originally plead the defense, Newburgh nevertheless preemptively rebuts such a defense in its brief in support of summary judgment. Pl. Br. at 5-7. The only evidence in support of the defense is that Newburgh selected one of three pre-opening budgets proposed by Insight in its management agreement with the knowledge that "whichever we choose will impact the basis for our damages claim against Adlabs." Bazydlo email (docket no. 22, ex. L). But Newburgh is not seeking to recover its pre-opening costs, so it is irrelevant that it purportedly chose the most expensive one. Moreover, nothing in this statement refutes the undisputed evidence that Newburgh sought a replacement tenant, and when it could not find one, engaged a management company to operate the theater that Adlabs agreed to run. There is simply no evidence in the record that Newburgh failed to mitigate its damages, and given the evidence produced so far regarding its mitigation efforts, it is unlikely there is any undiscovered evidence that would demonstrate that Newburgh failed to mitigate its damages. Therefore, it would be futile for Adlabs to assert a failure to mitigate defense.

Accordingly, for the all the above reasons, the Court denies Adlabs' motion for leave to amend the scheduling order and to amend its pleadings.

II. Newburgh's Summary Judgment Motion

Newburgh alleged alternative counts in its complaint. In its summary judgment motion, it requests judgment on its damages claim only, as well as on Adlabs' counterclaims. For the following reasons, the Court will grant Newburgh's motion in full and award damages.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, a court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

As stated above, the facts are undisputed and Newburgh is entitled to judgment as a matter of law with respect to liability and damages.

A. <u>Liability</u>

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127, n. 28 (1994). A court must "look for the intent of the parties in the words used in the instrument. [It] does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 491 (1998) (internal quotation marks omitted). The initial question of whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is also a question of law to be decided by the court. Only when the language is unclear or susceptible to multiple meanings does its determination of the parties' intention become a question for the fact-finder. *Port Huron Ed. Ass'n v. Port Huron Area School Dist.*, 452 Mich. 309, 323 (1996).

Adlabs argues that it was within its rights under the parties' understanding to terminate because Newburgh breached the Lease by not delivering possession of the premises in

"as-is, where-is" condition by January 1, 2009. This interpretation of the Lease, however, is contrary to its terms. The Lease is clear and unequivocal: so long as Newburgh used commercially reasonable efforts to obtain an early termination from AMC that allowed Adlabs to take possession of the premises in "as-is, where-is" condition by January 1, 2009, even if Newburgh was unable to deliver possession until January 15, 2010, Adlabs had no right to terminate. *See* Lease ¶ 3. Adlabs' sole remedy for taking possession after January 1, 2009 was the ability to pay 50% rent for each month after January 1, 2009 if it was unable to take possession. *Id.*

Adlabs even admits that under the terms of the Lease, Newburgh was only obligated to deliver possession by January 15, 2010 and that Adlabs had no right to terminate based on the fact that the premises were not delivered to it by January 1, 2009. It further admits that under the terms of the Lease, if Adlabs failed to open and continuously operate a theater and auditorium for the entire term of the Lease, it would be in breach. Gangwani dep. 84-87. Therefore, when Adlabs advised Newburgh in February 2009 that it was exercising its right not to move forward with the agreement, and refused to withdraw its letter, it wrongfully terminated the Lease.

Adlabs contends that despite the Lease's clear and unambiguous terms, the parties orally agreed before they signed the Lease that Adlabs' performance was conditioned entirely upon Newburgh's ability to deliver possession in "as-is, where is" condition by January 1, 2009, and that Adlabs had the option of terminating if possession could not be delivered by that date. Gangwani dep. 55-59; 84-87. Assuming such an agreement was made, which the Court must on summary judgment, the parol evidence rule prevents the Court from considering that agreement as part of the Lease.

"The parol evidence rule may be summarized as follows: parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *UAW-GM Human Res. Ctr.*, 228 Mich. App. at 492 (internal quotation marks and alterations omitted). The justification for the rule lies in the stability it gives to written contracts; without it, a party might avoid its obligation by claiming that a contemporaneous oral agreement released him from the duties he simultaneously assumed in writing. *Id.* Although there exists an exception to the rule for the threshold question of whether a contract is fully integrated, when the parties include an express integration clause in their written contract, the clause is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete "on its face" and, therefore, parol evidence is necessary for the "filling of gaps." *Id.* at 502.

The parol evidence rule applies here to exclude evidence of the parties' alleged contemporaneous agreement that Adlabs could terminate if it did not receive possession by January 1, 2009. The Lease contains an integration clause at paragraph 23 that merges all prior agreements between the parties into the agreement embodied in the Lease. Lease ¶ 23. This is conclusive evidence of integration and the Court must therefore disregard the alleged oral agreement between the parties and enforce the clear and unambiguous terms of the Lease. Under these provisions, Adlabs is in breach because it wrongfully terminated the Lease before the commencement date.

Attempting to take advantage of the fraud exception to the parol evidence rule, Adlabs contends that the contract was fraudulently induced and seeks to void the contract on that basis. Putting aside the fact that Adlabs has failed to allege fraud with any particularity as

required by Rule 9(b) of the Federal Rules of Civil Procedure,[6] the defense fails as a matter of law. In *UAW-GM*, the Michigan Court of Appeals addressed the circumstances in which a claim of fraud can void a contract when it contains an express merger clause. It recognized first that fraud generally makes a contract voidable at the election of the innocent party, and that parol evidence is admissible to prove such fraud. 228 Mich. App. at 503. But, when a contract contains a merger clause releasing all antecedent claims, only a certain type of fraud can vitiate the contract: fraud that invalidates the merger clause itself, *i.e.*, fraud relating to the merger clause or fraud that vitiates the entire contract, including any merger clause. *Id.* Thus, fraud that relates solely to an oral agreement later nullified by a valid merger clause does not render the contract voidable. *Id.*

The only allegation of fraud made by Adlabs is that Newburgh assured it, prior to signing the Lease, that it could terminate the Lease if it were not given possession by January 1, 2009. *See* Gangwani dep. 65 ("I would assume that the preconditions that we discussed, all were not in the lease."). This alleged fraud relates solely to an oral agreement that was nullified by the merger and has no effect on the agreement, provided the merger clause is valid. *UAW-GM*, 228 Mich. App. at 503. To succeed on its fraud claim, therefore, Adlabs must show that the merger clause is invalid due to fraud. A party can prove such fraud in two ways: 1) by showing that one party induced the other to believe that the prior oral agreement was included in the writing when it was not; or 2) by showing that one party caused the other to forget the prior oral agreement and execute an incomplete writing while at the same time describing the writing as complete. *Id.*

---

[6] "In complying with Rule 9(b), a plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 (6th Cir. 2005).

First, there is no evidence, and Adlabs does not assert, that Newburgh caused it to believe the preconditions were present in the agreement. The first few pages in the Lease clearly indicate that such a prior oral agreement was not part of the Lease. To succeed on the second of these two theories, Adlabs would have to show not only that it requested the inclusion of a clause covering the January 1, 2009 commencement date, but also that as a result of the Newburgh's fraudulent representations, it was induced to forget about the clause and to sign an agreement omitting the clause while describing the writing as complete. *Hamade v. Sunoco, Inc.*, 271 Mich. App. 145, 170 (2006). There is no evidence in the record to support such a theory. Finally, Adlabs has not demonstrated the existence of any fraud that would invalidate the *entire* agreement, including the merger clause.[7] As stated above, Adlabs' only allegation of fraud relates solely to an oral agreement regarding a commencement date of January 1, 2009 that was nullified by the merger clause in the Lease, which is insufficient to nullify the contract. Therefore, Adlabs' defense of fraud fails as a matter of law.

The terms of the contract clearly and unambiguously demonstrate the intent of the parties. Adlabs' conduct subsequent to signing the contract demonstrates, as a matter of law, that it breached the Lease agreement and is liable to Newburgh for damages.[8]

B. Damages

---

[7] Fraud that would invalidate the entire contract could take the form of, "tricking the other party into signing a document thinking it is something other than it is (a contract rather than a will, for example), or of misreading the contents of the document to the signor, or of inducing the signor not to the read the contents of the document at all." *Tocco v. Tocco*, 409 F. Supp. 2d 816, 828-29 (E.D. Mich. 2005). None are present in this case.

[8] Because the Court applies the parol evidence rule to prevent Adlabs from relying on a prior oral agreement that varies the terms of the Lease, the Court need not consider Newburgh's argument that the Michigan Statute of Frauds, Mich. Comp. Laws § 566.106, would prevent Adlabs from relying on an oral agreement that it could terminate the Lease in the event it did not obtain possession by January 1, 2009.

The only remaining issue is the amount of damages. In the event of a contract breach, the aggrieved party is entitled to the benefit of the bargain set forth in the agreement. *Ferguson v. Pioneer State Mutual Ins. Co.*, 273 Mich. App. 47, 54 (2006). The proper measure of damages is the "pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Id.* (internal quotation marks omitted). Under Michigan law, a landlord's damages due to a tenant's breach of a lease is measured by the excess of the agreed rent over: 1) the rental value of the property, or 2) the rent the plaintiff can obtain for the property through reasonable diligence. *See Tel-Ex Plaza, Inc. v. Hardees Rests., Inc.*, 76 Mich. App. 131, 134 (1977). Newburgh has provided no evidence of the rental value of the premises, and was unable to secure a replacement tenant despite its efforts. It has, however, entered into the Management Agreement with Insight that enables it to derive at least some value from the premises in the form of the operational reserves and gross profits. In this case, then, the proper measure of damages is the difference between i) the rent provided for in the lease with Adlabs; and ii) the operational reserves and gross profits under the Management Agreement with Insight, less the portion of the real estate taxes Adlabs agreed to pay, which Adlabs will now have to pay. Adlabs has never disputed this measure of damages, nor has it submitted evidence that would create a genuine issue of material fact regarding the calculation of damages. Nor has it impugned this measure as speculative.

Under the terms of the Lease, annual rent is $512,304.00 for each of the first two years,[9] $683,072.04 for each of the next three years, $725,764.00 for each of the middle

_____

[9] For year one of the Lease, assuming Adlabs would have taken possession on April 2009, it would have been able to pay 50% rent for the first three months, reducing the rent for year one by $64,038, for a total of $448,266.

five years, and $768,456.00 for each of the last five years. Lease ¶ 1(f). As indicated above, Newburgh was to receive an estimated $214,880.82 from Insight each year through the form of unused operational reserves and gross profits, less Adlabs' portion of the estimated annual real estate taxes. Accordingly, during the five-year management agreement, the measure of damages is demonstrated by the following:

Year 1:      $448,266.00 - $214,880.82 = $233,385.18

Year 2:      $512,304.00 - $214,880.82 = $297,423.18

Years 3-5:  $683,072.04 - $214,880.82 = $468,191.22 (per year)

The Management Agreement is a five year agreement, but includes the option for one year renewals subject to the concurrence of the parties. Management Agreement Art. V, ¶ A. The Court must assume that Newburgh will renew the agreement in its effort to mitigate damages. Indeed, Newburgh has a duty to renew its agreement with Insight, if possible, in order to mitigate its damages. Using the year one estimates for operational reserves, gross profits, and real estate taxes, the measure of damages for years six through fifteen are as follows:

Year 6:      $725,764.00 - $214,880.82 = $510,883.18

Year 7:      $725,764.00 - $214,880.82 = $510,883.18

Year 8:      $725,764.00 - $214,880.82 = $510,883.18

Year 9:      $725,764.00 - $214,880.82 = $510,883.18

Year 10:    $725,764.00 - $214,880.82 = $510,883.18

Year 11:    $768,456.00 - $214,880.82 = $553,575.18

Year 12:    $768,456.00 - $214,880.82 = $553,575.18

Year 13:    $768,456.00 - $214,880.82 = $553,575.18

Year 14:    $768,456.00 - $214,880.82 = $553,575.18

Year 15:     $768,456.00 - $214,880.82 = $553,575.18

Michigan law requires that future damages in a non-personal injury case be reduced to present value using a simple – as opposed to compound – five percent interest calculation.  *See* M. Civ. JI 53.03; *see Nation v. W.D.E. Elec. Co.*, 454 Mich. 489, 493 (1997) (M. Civ. JI 53.03 is applicable in cases not covered by personal injury reduction-to-present-value statute).  Under this method of calculation, the Court must divide each year's damages by 1.05 for the first year, 1.10 for the second year, 1.15 for the third, etc.  The following table, therefore, represents the calculation of the total damages:

Year 1:      $233,385.18 / 1.00 = $233,385.18[10]

Year 2:      $297,423.18 / 1.05 = $283,260.17

Year 3:      $468,191.22 / 1.10 = $425,628.38

Year 4:      $468,191.22 / 1.15 = $407,122.80

Year 5:      $468,191.22 / 1.20 = $390,159.35

Year 6:      $510,883.18 / 1.25 = $408,706.54

Year 7:      $510,883.18 / 1.30 = $392,987.06

Year 8:      $510,883.18 / 1.35 = $378,431.99

Year 9:      $510,883.18 / 1.40 = $364,916.55

Year 10:     $510,883.18 / 1.45 = $352,333.23

Year 11:     $553,575.18 / 1.50 = $369,050.12

Year 12:     $553,575.18 / 1.55 = $357,145.28

---

[10] Damages representing the first year of rent are not reduced to present value because they are not for a future amount and only future amounts are subject to reduction.  Because Adlabs would have received possession in April 2009 according to the proposed AMC early termination agreement, as of this date, Newburgh has *already incurred* damages for the first year's rent so it need not be reduced.

Year 13:    $553,575.18 / 1.60 = $345,984.49

Year 14:    $553,575.18 / 1.65 = $335,500.11

Year 15:    $553,575.18 / 1.70 = $325,632.46

**TOTAL: $5,370,243.71**

This amount must be reduced by any benefits that accrued to Newburgh as a result of Adlabs' breach. *See Tex-El Plaza*, 76 Mich. App. 134. One benefit that incurred to Newburgh as a result of Adlabs' breach was that Newburgh did not go through with the early termination agreement with AMC, under which Newburgh agreed to pay to AMC a one-time fee of $500,000 to vacate early and leave the film equipment intact.[11] Proposed Early Termination Agreement ¶ 2. Newburgh saved the $500,000 that it would have otherwise had to pay had Adlabs not wrongfully terminated. Accordingly, Newburgh's damages will be reduced by $500,000. Newburgh is entitled to $4,870,243.71 in damages.

Newburgh has requested recovery of attorneys' fees and expenses. The Court invites Newburgh to move for such fees post-judgment in accordance with E.D. Mich. LR 54.1.2.

C. Adlabs' Counterclaim

Finally, Newburgh is also entitled to summary judgment on Adlabs' Counterclaim. In count one of its counterclaim, Adlabs alleges that Newburgh breached the Lease by failing to use commercially reasonable efforts to acquire the premises from AMC prior to January 1, 2009. The only basis asserted for this claim is that Adlabs did not obtain possession by January 1, 2009. Gangwani dep. 67. The end result of its efforts, however, does not determine whether Newburgh used such efforts. As demonstrated by the testimony

---

[11] Newburgh's calculation of damages in its brief does not account for this benefit of Adlabs' breach. Neither does Adlabs discuss this benefit in its briefing. Nevertheless, it is clear that because of Adlabs' breach, Newburgh received the benefit of not having to pay this one-time fee it agreed to pay in order to obtain an early termination from AMC.

regarding its negotiations with AMC and the proposed early termination agreement that was eventually sent to AMC for review, Newburgh did use commercially reasonable efforts to obtain an early termination. As far as the record indicates, the only reason that agreement was never executed was because Adlabs backed out of the deal before it was signed and Newburgh was attempting to maintain occupancy in order to mitigate its damages.

Count one also claims that Newburgh breached the Lease by failing to timely deliver possession. This claim fails because, as discussed above, Adlabs terminated before Newburgh was required to deliver possession on January 15, 2010. Newburgh's obligation to deliver possession ceased once Adlabs terminated in February 2009. *See Able Demolition v. Pontiac*, 275 Mich. App. 577, 585 (2007) ("The rule in Michigan is that the one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform.")

Finally, count one also claims that Newburgh breached the Lease be failing to obtain the premises from AMC in "as-is, where-is" condition, with all of the improvement, fixtures, and trade fixtures left in place. Its claim is belied by the proposed early termination agreement, which provided that AMC would have left the premises in such a condition. Proposed Early Termination Agreement ¶ 4. Again, the only reason AMC and Newburgh failed to execute the agreement was because Adlabs backed out of its obligations by terminating. Accordingly, Newburgh is entitled to judgment as a matter of law with respect to all claims of breach in count one of Adlabs' counterclaim.

In count two of its counterclaim, Adlabs seeks reformation of the Lease on the basis that the Lease was executed under a mutual mistake of fact and/or through the mistake of Adlabs and the fraud of Newburgh. Unilateral mistake provides no legal basis for reforming a written contract. *See Casey v. Auto Owners Ins. Co.*, 273 Mich. App. 388, 398 (2006).

A contract may be reformed if fraud by a party induced the contract, or if there was a mutual material mistake of fact that induced the contract. *Id.* There is no support in the record to support a claim of mutual mistake. Before the commencement of this lawsuit, Adlabs never claimed there was any mistake in executing the Lease. Gangwani dep. 76. Adlabs' fraud claim also fails as a matter of law. Adlabs has identified no misrepresentation made by Newburgh. Additionally, in order to establish fraud, the allegedly false statements must, among other things, relate to past or existing facts, not to future promises or expectations. *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976). So, even if Newburgh had told Adlabs that it would definitely have possession by January 1, 2009, this statement regards a future event and cannot support a fraud claim. Moreover, fraud includes the element of reasonable reliance on the statement. *Hi-Way Motor Co.*, 398 Mich. at 336. But reliance upon an oral representation, even if false, is unreasonable if the party enters into a subsequent agreement containing an integration clause. *See, e.g.*, Cook, 210 F.3d at 659 ("The existence of an integration clause in the franchise agreements made Cook's alleged reliance unreasonable."). Accordingly, Newburgh is entitled to judgment as a matter of law on Adlabs' claim for reformation.

## CONCLUSION AND ORDER

The language in the Lease is clear and unambiguous. Newburgh had until January 15, 2010 to deliver possession in "as-is, where-is" condition. Adlabs had no right under the terms of the Lease to terminate in the event Newburgh was unable to deliver possession by January 1, 2009. Since the Lease is fully integrated and there was no fraud with respect to the merger clause, the parol evidence rule prevents consideration of any prior oral agreement between the parties to the effect that Adlabs could terminate in the event Newburgh was unable to deliver possession by January 1, 2009. The facts are undisputed

and Newburgh is entitled to judgment as a matter of law on its damages claim as well as Adlabs' counterclaims for breach of contract and reformation.

**WHEREFORE** it is hereby **ORDERED** that Adlabs' motion for leave to amend the scheduling order and for leave to amend its pleadings (docket no. 28) is **DENIED.**

**IT IS FURTHER ORDERED** that Newburgh's motion for summary judgment (docket no. 19) on its claim for damages is **GRANTED.** Judgment will be entered in favor of Newburgh.

**SO ORDERED.**

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: July 13, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 13, 2010, by electronic and/or ordinary mail.

Alissa Greer
Case Manager